IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ALESIA BURNETTE, et al.

                    Plaintiffs,

         v.                                          CIVIL ACTION
                                                     NO. 17-12128
HILTON FRANCHISE HOLDINGS LLC, et
al.,

                    Defendants.

## OPINION

**Slomsky, J.**                                          **January 13, 2021**

### TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 2

   A.   The Incident on May 13, 2017 ................................................................ 2

   B.   The Relationship Among Defendants, the Franchise License Agreement,
        and the Brand Standards ........................................................................ 4

   C.   Compliance with and Operation of Brand Standards for the Pool ..................... 8

      1.   DoubleTree Defendants' Compliance with Brand Standards ......................... 8

      2.   Operation of the Pool ........................................................................ 9

   D.   Procedural History .............................................................................. 10

III.  STANDARD OF REVIEW ................................................................................ 11

IV.   ANALYSIS ...................................................................................................... 12

   A.   Hilton Defendants' Vicarious Liability for the Alleged Negligence
        of DoubleTree Defendants .................................................................... 13

      1.   Actual Authority ............................................................................. 14

2.   Apparent Authority ................................................................................. 18

B.   Hilton Defendants' Direct Liability ................................................................ 19

C.   DoubleTree Defendants' Vicarious Liability for the Actions
     of Best Pool Management, Inc. ..................................................................... 20

D.   DoubleTree Defendants' Direct Liability ...................................................... 22

V.   CONCLUSION ................................................................................................... 25

## I.        INTRODUCTION

On May 13, 2017, Bria Johnson checked into the DoubleTree Suites by Hilton Hotel (the "Hotel").  Unbeknownst to the Hotel staff, Ms. Johnson brought eight children with her.  One of the children, Khadir Baynes ("Khadir"), went to the Hotel's indoor pool (the "Pool") area.  A lifeguard was stationed there.  The lifeguard subsequently left the Pool area, after which Khadir entered the Pool and began to drown.  He later died from drowning.

On November 28, 2017, following Khadir's death, his parents ("Plaintiffs") filed this action against the Hotel and Davis Enterprises ("Davis"), the owner of the Hotel.  (See Doc. No. 1.)  Plaintiffs also sued the franchisor of the Hotel, Hilton Franchise Holdings, LLC, and the parent corporation of the franchisor, Hilton Worldwide Holdings, Inc.[1]  (See id.)  Best Pool Management, Inc., the company hired to provide lifeguard services at the Hotel, was also sued, but subsequently settled with Plaintiffs.  (See Doc. Nos. 19, 55.)  Plaintiffs made allegations against these Defendants in several Complaints, the Second Amended Complaint ("SAC") (Doc. No. 19) being the operative one here.  In the SAC, Plaintiffs allege that each Defendant was negligent in causing Khadir's death.

On October 30, 2019, Plaintiffs filed the instant Motion for Summary Judgment against Hilton Defendants, the Hotel, and Davis (Doc. No. 98).  On November 13, 2019, Hilton Defendants only filed a cross-Motion for Summary Judgment against Plaintiffs (Doc. No. 101).  Responses and Replies were filed (Doc. Nos. 102, 105, 106), and on November 11, 2020, after a hearing on the cross-Motions for Summary Judgment, Plaintiffs and all Defendants filed Supplemental Briefs (Doc. Nos. 122, 123).

---

[1]   Hilton Franchise Holdings, LLC and Hilton Worldwide Holdings, Inc. collectively will be referred to as the "Hilton Defendants."

Both cross-Motions for Summary Judgment are now ripe for disposition.  For reasons that follow, Hilton Defendants' cross-Motion (Doc. No. 101) will be granted, and Plaintiffs' cross-Motion (Doc No. 98) will be denied.

## II.    BACKGROUND

### A.    The Incident on May 13, 2017

On Saturday, May 13, 2017 at 3:23 p.m., Bria Johnson checked into the DoubleTree Suites by Hilton Hotel in Mount Laurel, New Jersey (the "Hotel").  (See Doc. Nos. 102 at 1-2 ¶¶ 1-3; 102-1 at 8 ¶¶ 12-16.)  Ms. Johnson made a reservation for two adults, but she checked in alone.  (See Doc. No. 101-9 at 7.)  When checking in, Ms. Johnson did not tell the Hotel's front desk employee how many people were checking into the room with her.  (See Doc. No. 102-1 at 8 ¶¶ 4-9.)  Unbeknownst to the front desk employee, Ms. Johnson had eight children waiting in her car who she intended to bring into the Hotel with her.  (See Doc. Nos. 101-9 at 7; 102-1 at 5 ¶¶ 16-20, 6 ¶¶ 4-9.)

On weekends, the Hotel provides a one-page check-in notice to guests with children. (See Doc. No. 101-9 at 7.)  This notice states:

> [C]hildren under the age of sixteen must be accompanied by a parent or guardian while using the swimming pool.  As posted, the hotel does not provide lifeguards and all children must be supervised by a parent or guardian at all times . . . . Outside guests are also NOT permitted in the pool under any circumstances. ONLY registered hotel guests are allowed to use the facilities of the hotel – pool, fitness room, etc.  Registered guests are those declared at check-in and listed on the registration card on file.  Every person in the room must be a registered guest in order to stay in the hotel and use the facilities.  If only one person is registered, all others may be asked to leave.

(Id.)  Ms. Johnson denies receiving this notice; however, she is a front desk employee at another DoubleTree hotel in Philadelphia.  (See Doc. No. 101-9 at 8; 102-1 at 3 ¶¶ 6-9.)  In this role, she hands out a similar notice to guests at her employer hotel.  (See Doc. No. 101-9 at 8.)

2

After checking in, Ms. Johnson brought the children into the Hotel through a separate entrance.  (See Doc. No. 102 at 12 ¶ 4.)  Once they were inside, Ms. Johnson allowed five of the eight children, including her nephew Khadir Baynes ("Khadir"), to enter the Hotel's Pool area despite knowing that Khadir could not swim.  (See Doc. Nos. 99 at 3 ¶10; 101-9 at 7.)

At 3:55 p.m., Khadir and the other four children entered the pool (the "Pool") area without either Ms. Johnson or any other adult.  (See Doc. Nos. 101-2 at 3 ¶ 2; 101-9 at 8; 101-9 at 7; 105-1 at 1 ¶ 2.)  At that time, Logan DeBlieu, the lifeguard hired by Best Pool Management, Inc., was on duty at the Pool area from 10:00 a.m. until 4:00 p.m.  (See ids.; Doc. No. 99 at 3 ¶¶ 9-10.)  DeBlieu noticed that the children were alone, asked the children where their parents were, and they told him that Ms. Johnson was going to be at the Pool area soon.  (See Doc. No. 102-4 at 7 ¶¶ 20-24.)  At that time, because they were alone, the rule against unsupervised children being at the Pool was violated.  (See id.)  DeBlieu had the authority to ask the children to leave the Pool area; however, he allowed them to remain.[2]  (See Doc. Nos. 101-9 at 8; 102 at 12 ¶ 7; 102-4 at 4 ¶¶ 10-12, 20-24.)

At 4:04:00 p.m., after his shift ended, DeBlieu left the Pool area and walked towards the Hotel's front desk.  (See Doc. Nos. 99 at 3 ¶¶ 9; 101-9 at 8-9.)  Approximately thirty seconds after DeBlieu left the Pool area, Khadir entered the Pool and ten seconds later began to struggle.  (See Doc. Nos. 99 at 6 ¶ 30; 101-9 at 8.)  Eight seconds after Khadir began to struggle, at roughly 4:04:48 p.m., DeBlieu reached the Hotel's front desk and told Christophe Pride, the front desk employee, that unsupervised children were in the Pool area.  (See Doc. Nos. 99 at 3-5 ¶¶ 10, 20-24; 101-2 at 6-7 ¶¶ 20, 24-25; 101-9 at 8-9.)  DeBlieu left the front desk nearly thirty seconds

---

[2]  DeBlieu testified in his deposition that he knew about the rule against allowing unsupervised children in the Pool area, but he "did not choose to enforce it" because he said "their parents would be able to find them easily once they arrived."  (Doc. No. 102-4 at 4 ¶¶ 10-24, 5 ¶ 1.)

later as Khadir continued to struggle.  (See Doc. No. 101-9 at 9.)  At about 4:06 p.m., over a minute and a half after Khadir began to drown, he stopped struggling.  (See Doc. No. 99 at 6 ¶ 30.)  He was pulled from the Pool at about 4:08 p.m.  (See id.)  On May 18, 2017, after five days of critical care treatment, Khadir died from drowning.  (See id. at ¶ 31.)

B. **The Relationship Among Defendants, the Franchise License Agreement, and the Brand Standards**

Defendant Hotel is owned by Defendant Davis Enterprises ("Davis"), and both collectively will be referred to as "DoubleTree Defendants."  (See Doc. Nos. 101-2 at 3 ¶ 4; 105-1 at 2 ¶ 4.)  In 2011, DoubleTree Defendants entered into a franchise agreement with Defendant Hilton Franchise Holdings, LLC.  (See ids.)  As noted, Hilton Franchise Holdings, LLC is owned by Defendant Hilton Worldwide Holdings, Inc., and both are referred to as "Hilton Defendants".  (See Doc. Nos. 101-2 at 3 ¶ 5; 105-1 at 2 ¶ 5.)

The relationship between DoubleTree and Hilton Defendants is governed by a franchise agreement, titled Franchise License Agreement (the "FLA"), and by Hilton's Brand Standards (the "Brand Standards").  (See Doc. No. 99 at 9 ¶ 47.)  The FLA gives DoubleTree Defendants a license to use Hilton Defendants' brand in operating the Hotel.  (See Doc. No. 101-4 at 5.)  It further provides:

> [A]lthough [Hilton Defendants] provide the [Brand] Standards, [DoubleTree Defendants] have exclusive day-to-day control of the business and operation of the Hotel and [Hilton Defendants] do not in any way possess or exercise such control . . . .  [DoubleTree Defendants are] an independent contractor.  Neither of us is the legal representative or agent of the other or has the power to obligate the other for any purpose.  [DoubleTree Defendants] acknowledge that [Hilton Defendants] do not supervise or direct [DoubleTree Defendants'] daily affairs and that [DoubleTree Defendants] have exclusive control over [their] daily affairs.  [DoubleTree Defendants] expressly acknowledge that we have a business relationship based entirely on, and defined by, the express provisions of [the FLA] and that no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.

4

(Doc. Nos. 101-4 at 12; 101-5 at 15.)

Regarding the Brand Standards, they are "minimum standards, procedures, rules, regulations, policies, and techniques" Hilton Defendants require their DoubleTree franchisees to meet.  (Doc. No. 99-14 at 13.  See also Doc. No. 99 at 10 ¶¶ 53-54.)  Julie Garrison, Hilton's Vice President of Brand Management, testified in her deposition that the Brand Standards' purpose is "[t]o provide minimum standards to ownership entities so that their properties can provide a consistent experience."  (Doc. No. 101-10 at 9 ¶¶ 16-20.)  For example, the Brand Standards include directives on 24-hour operation, providing a cookie to guests upon check-in, and "compl[iance] with the local laws and regulations."  (Doc. Nos. 101-2 at 10-11; 101-12 at 4 ¶¶ 2-6.)  The Brand Standards require the following regarding swimming pool operation:

1301.01    HOURS OF OPERATION

> The pool, sauna, and whirlpool facilities must be open and accessible to registered guests from 6:00 a.m. until 10 p.m. daily, weather and climate permitting.

1301.02    DESIGN, CONSTRUCTION AND SIGNAGE

> Pool operating hours must be prominently posted at all pool area entrances.

1301.03    SAFETY AND SECURITY

1301.03.A    EQUIPMENT

> The following equipment is required and must be provided for and/or readily available at the swimming pool:

1301.03.A.1    One shepherd's hook[3] or reach pole

---

[3]   A shepherd's hook is a "long aluminum or fiberglass pole [that] has a curved hook on the end that you can put where a person in trouble can grab it or can wrap around a victim to save them."  Mary Donahue, How to rescue a downing victim using a reaching assist or a shepherd's crook, (last accessed Jan. 11, 2021), https://marydonahue.org/how-to-rescue-a-drowning-victim-using-a-reaching-assist-or-a-shepherds-crook.

1301.03.A.2        One United States Coast Guard or international equivalent approved life ring or throw bag for each swimming pool

1301.03.B        WATER MAINTENANCE

1301.03.B.1        TEMPERATURES

1301.03.B.1.a        INDOOR POOL

Indoor pools must be maintained at a minimum of 83 °F/28.3 °C.

1301.03.B.1.b        OUTDOOR POOL

Outdoor pools must have temperature maintained between 80 °F/26.7 °C and 89 °F/31.7 °C. Locations where pool water temperature will rise above 89 °F/31.7 °C must provide cooling systems to maintain pool water temperatures within the specified range.

1301.03.B.1.c        WHIRLPOOL

The whirlpool must be operated between the temperatures of 99 °F/37.2 °C and 103 °F/39.4 °C. The water is never allowed to be in excess of 104 °F/40 °C.

1301.03.B.2        CHEMICAL BALANCE

Chemical balance of the pool should be checked and ensured to be within guidelines prior to opening and thereafter.  At a minimum, manual testing of the pool and whirlpool water must be taken and recorded two times per day, or more frequently if required by applicable law . . . .

[. . .]

1301.03.D        UNDERWATER LIGHTING

Underwater swimming pool/spa light must be illuminated dusk to dawn with no exceptions.

1301.03.E        LOCKED GATES

The entrance door to the pool area must have an electronic card key access lock.  The pool area must be secured and accessible only to appropriate hotel staff during off hours . . . .

[. . .]

1301.03.G    ANTI-VORTEX PLATES[4]

The hotel must ensure that anti-vortex plates are replaced in accordance with manufacturer guidelines, typically every 5 years.

1301.04    POOL TOWELS

Brand-approved pool towels must be available at all times during pool and/or beach operation.  The pool towel must be a minimum size of 34" or 35" x 70", 18 lb./dozen (88.9cm x 177.8cm / 8.2kg).

1301.04.A    TOWEL BIN

A decorative towel bin must be provided for used towels . . . .

[. . .]

1301.06    POOL FURNITURE

Plastic pool furniture is not permitted.  Cushions are required on all chaise lounges and chairs where a guest would be in direct contact with a hard surface (e.g., wood, hard resin, metal, etc.).  Fabric and/or woven sling style pool furniture is exempt.

Replacement pool furniture must be approved through the Design Review Process . . . .

Furniture or décor constructed of or containing glass is strictly prohibited for use in the pool area.

(Doc. No. 101-8 at 3-4.)

In accordance with the FLA and Brand Standards, Hilton Defendants conduct biannual audits of the Hotel to ensure DoubleTree Defendants' compliance with the Brand Standards. (See Doc. No. 99 at 9 ¶ 49.)  Julie Garrison testified that in checking for Brand Standard

---

[4]    An anti-vortex plate is a safety device that prevents a swirling motion in a whirlpool that can harm a swimmer.

compliance, Hilton Defendants do not "control or supervise the operation of, or staff at, the Hotel[,]" (Doc. No. 102-8 at 4 ¶ 10), because they leave Brand Standards implementation "up to the management company[.]"   (Doc. No. 101-10 at 11 ¶¶ 13-14.)   Furthermore, Hilton Defendants do not have any employees at the Hotel and they do not employ any of the Hotel's employees, including Dean Sampson, the Hotel's General Manager; however, Hilton Defendants do provide training for the Hotel's employees.  (See Doc. No. 101-2 at 4 ¶ 13, 5 ¶¶ 15, 17, 6 ¶ 19.)

### C.    Compliance with and Operation of Brand Standards for the Pool

Plaintiffs aver that the Pool was negligently operated.  (See Doc. No. 99-1 at 4-7.)  For summary judgment purposes, determining the purported negligence of all Defendants requires the consideration of the Pool's conditions, particularly regarding DoubleTree Defendants' compliance with the Brand Standards, and the Pool's operation on May 13, 2017.

### 1.    DoubleTree Defendants' Compliance with Brand Standards

DoubleTree Defendants exceed the Brand Standards requirements on lifeguard usage and Pool signage.  Although it is not required by the Brand Standards, DoubleTree Defendants retain lifeguard services for the Pool through Best Pool Management, Inc.  (See Doc. Nos. 101-2 at 6 ¶ 20; 105-1 at 17 ¶ 20.)  On weekends, lifeguards are at the Pool until 4:00 p.m.  (See Doc. No. 101-2 at 6-7 ¶¶ 20, 24.)  On May 13, 2017, a Saturday, Best Pool Management employee Logan DeBlieu was the lifeguard on duty at the Pool.  (See Doc. Nos. 99 at 3 ¶ 9; 101-2 at 6-7 ¶¶ 20, 24-25.)  Although the Brand Standards only require posting signs in the Pool area that note the hours of operation, DoubleTree Defendants placed signs around the Pool stating the hours of operation, the Pool rules, no lifeguard on duty, and the Pool area may be slippery.  (See Doc. Nos. 99 at 14 ¶ 94; 99-1 at 5; 99-16 at 5-7, 10.)

Despite these additional measures, DoubleTree Defendants did not meet the Pool Brand Standards on locked gates because they did not install electronic card key locks at the Pool's entrances.  (See Doc. Nos. 99 at 13 ¶ 82; 99-1 at 4; 101-8 at 3; 122 at 2-3.)  Hilton Defendants, however, had given DoubleTree Defendants extensions to comply with this Brand Standard. (See Doc. Nos. 122 at 3; 122-3 at 150 ¶¶ 11-22.)  Pool area access also was compromised because, as General Manager Sampson noted in his deposition, Hotel guests keep the Pool doors open to "try to get around the system . . . to sneak people into the [P]ool."  (Doc. No. 101-12 at 15 ¶¶ 14-16; see also 122-2 at 3 ¶¶ 19-21.)

### 2.      Operation of the Pool

As the FLA states, DoubleTree Defendants "have [] day-to-day control of the business and operation of the Hotel[,]" which includes the Pool.  (Doc. No. 101-4 at 12.)  According to General Manager Sampson, Hotel employees are required to be "aware of what all the [B]rand [S]tandards are" and are "obligated to make sure that [the Hotel] meet[s] the [B]rand [S]tandards."  (Doc. No. 101-12 at 6 ¶¶ 17-19, 8 ¶¶ 8-9.)  Furthermore, Sampson and other employees of Defendant Davis have "conversations about maintenance of the [P]ool area and also the construction of the [P]ool area."  (Id. at 12 ¶¶ 17-19.)  In maintaining the Pool area, Sampson "[a]s manager on duty . . . [is] responsible [for] keep[ing] an eye on the [P]ool . . . during open operations."  (Id. at 16 ¶¶ 17-20.)  This responsibility requires him to tell other Hotel managers and front desk staff about the rule prohibiting unsupervised children in the Pool area. (Id. at 16 ¶¶ 21-24, 17 ¶¶ 1-4.)

In addition to taking these actions, DoubleTree Defendants also hire Best Pool Management, Inc. to provide lifeguard services.  (See Doc. Nos. 101-2 at 6 ¶ 20; 105-1 at 17 ¶ 20.)  In working with Best Pool Management, Inc., DoubleTree Defendants "set the hours,

control[] the issuing of supplies, such as the test kits and log book, and reprimand[] the lifeguards and instruct[] them on how to interact with [H]otel guests." (Doc. No. 99-1 at 8.) Sampson noted in his deposition, however, that he does not instruct lifeguards on the rule prohibiting unsupervised children in the Pool because "[t]hey're [hired by] an independent company[,] [a]nd they should be trained to know that children don't swim alone; that's a standard." (Doc. No. 101-12 at 17 ¶¶ 8-11.) Moreover, lifeguard Logan DeBlieu testified in his deposition "that his boss was Nebila Rollins of Best Pool Management[,] . . . [he] did not meet with anyone from the DoubleTree to talk about [P]ool rules or [P]ool equipment[, and] . . . [he] was not given any written materials by anyone at the [H]otel regarding the rules of the [P]ool." (Doc. No. 122 at 6.)

### D.    Procedural History

On November 28, 2017, Khadir's parents, Plaintiffs Alessia Burnette and Jerell Baynes ("Plaintiffs"), as the administrator and administratrix of their son's estate, filed this action in the United States District Court for the District of New Jersey. (See Doc. No. 1.) In the SAC, Plaintiffs allege that DoubleTree Defendants and Best Pool Management, Inc. negligently operated the Pool and that their negligence caused Khadir's death.[5] (See Doc. Nos. 8 at 6-10 ¶¶ 30-35, 43-48; 101-2 at 3, 6 ¶¶ 4, 20.) They further allege that Hilton Defendants were directly negligent in causing Khadir's death and also are vicariously liable for the death as a result of the

---

[5]   In the SAC, Plaintiffs make the following claims against Defendants: (1) Count I—Negligence/Personal Injury by DoubleTree and Hilton Defendants; (2) Count II—Negligence/Personal Injury by Best Pool Management, Inc.; (3) Count III—Wrongful Death by all Defendants; (4) Count IV—Survival by all Defendants. (See Doc. No. 19.) Although the wrongful death and survival claims are set forth in separate counts of the SAC, neither party has moved for summary judgment on these counts. However, because Hilton Defendants are being dismissed as defendants in this case, the wrongful death and survival actions filed against them become moot and will be dismissed as to them.

alleged negligence of DoubleTree Defendants.  (See Doc. Nos. 8 at 6-7 ¶¶ 30-35, 39; 101-2 at 3 ¶¶ 4-5.)

On October 30, 2019, Plaintiffs filed the instant Motion for Summary Judgment against DoubleTree and Hilton Defendants (Doc. No. 98).  Plaintiffs contend that they are entitled to summary judgment because: (1) Hilton Defendants are vicariously liable for DoubleTree Defendants' alleged negligence; (2) Hilton Defendants were directly negligent in causing Khadir's drowning; (3) DoubleTree Defendants are vicariously liable for Defendant Best Pool Management, Inc.'s alleged negligence; and (4) DoubleTree Defendants were directly negligent in causing Khadir's drowning.  (See ids.)

On November 13, 2019, only Hilton Defendants filed a cross-Motion for Summary Judgment (Doc. No. 1010, arguing that they are entitled to summary judgment because they had no agency relationship with DoubleTree Defendants, and for this reason, they are not vicariously liable.  (See Doc. No. 101-2 at 12-13.)  Moreover, they assert that because they neither owned nor possessed the Hotel, they did not owe a duty to Khadir as a landowner and thus are not directly liable for his death.  (See Doc. No. 122 at 11-12.)

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (internal quotations omitted) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n,

601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" "only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party[.]"  <u>Kaucher v. Cty. Of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  <u>Favata</u>, 511 F. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  <u>Id.</u> (quoting <u>Azur</u>, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Id.</u> (alteration in original) (quoting <u>Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.</u>, 587 F.3d 176, 181 (3d Cir. 2009)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  <u>Anderson</u>, 477 U.S. at 247-49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the court must credit the nonmoving party's evidence over that presented by the moving party.  <u>Id.</u> at 255. If there is no factual issue, and only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  <u>Id.</u> at 250.

## IV.   ANALYSIS

The parties contest whether summary judgment should be granted regarding Khadir Baynes's drowning on May 13, 2017 on the following claims: (1) Hilton Defendants' vicarious liability for DoubleTree Defendants' alleged negligence (<u>see</u> Doc. Nos. 99-1 at 8; 101-2 at 9); (2) Hilton Defendants' direct liability for the incident (<u>see</u> Doc. Nos. 99-1 at 10; 122 at 11); (3)

DoubleTree Defendants' vicarious liability for Defendant Best Pool Management, Inc.'s alleged negligence (see Doc. Nos. 99-1 at 7; 122 at 5-6); and (4) DoubleTree Defendants' direct liability for the incident (see Doc. Nos. 99-1 at 3; 122 at 5).   Each of these claims will be discussed seriatim.

As a threshold matter, the parties agree that New Jersey law applies to this case, but dispute whether Hilton and DoubleTree Defendants are liable to Plaintiffs under various theories of negligence.   "Because negligence sounds in common law tort doctrine, we apply New Jersey substantive law."   Capriglione v. Radisson Hotels Int'l, Inc., No. 10-2845, 2011 WL 4736310, at *2 (D.N.J. Oct. 5, 2011) (citing Marino v. Indus. Crating Co., 358 F.3d 241, 243 n.2 (3d Cir. 2004)).

### A.   Hilton Defendants' Vicarious Liability for the Alleged Negligence of DoubleTree Defendants

Both Plaintiffs and Hilton Defendants move for summary judgment on whether Hilton Defendants are vicariously liable for the alleged negligence of DoubleTree Defendants.   Hilton Defendants would be vicariously liable for DoubleTree Defendants' alleged negligence if an agency relationship exists between the parties.   See J.M.L. ex rel. T.G. v. A.M.P., 877 A.2d 291, 296 (App. Div. 2005).   An agency relationship can arise if there is either actual or apparent authority for the agent to act on the principal's behalf.   See Restatement (Third) Of Agency §§ 2.01, 2.03 (2006).   "Actual authority is a consequence of a principal's expressive conduct toward an agent," and "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent . . . ."   Ids.

Plaintiffs contend that DoubleTree Defendants have actual and apparent authority to act as Hilton Defendants' agent.   Hilton Defendants submit that DoubleTree Defendants have no such authority and, for this reason, no agency relationship exists.   When viewing the facts here in

the light most favorable to Plaintiffs, they have not established that there is a genuine dispute of material facts showing that Hilton and DoubleTree Defendants have an agency relationship stemming from either actual or apparent authority.  When viewing the same facts in the light most favorable to Hilton Defendants, it is evident that no agency relationship has been shown. Therefore, summary judgment will be granted in favor of Hilton Defendants, and denied as to Plaintiffs.

## 1.    Actual Authority

Plaintiffs argue that an agency relationship based on actual authority exists between DoubleTree and Hilton Defendants because Hilton Defendants exercise day-to-day control over the Hotel.  (See Doc. No. 99-1 at 8.)  As noted in eTeam, Inc. v. Hilton Worldwide Holdings, Inc.:

> The hallmark of an agency relationship is that the principal has the right to control the manner in which the agent performs his duties[.]  Drexel v. Union Prescription Venters, Inc., 582 F. 2d 781, 785 (3d Cir. 1978).  In the franchise context, this means that the franchisor is able to exercise control over the day-to-day operations of the franchise.   See J.M.L. ex rel. T.G., 379 N.J. Super at 151 (finding no agency relationship where franchisor did not exercise control over day-to-day operations of the franchise).
>
> The Third Circuit has noted the difficulties of applying traditional principles of agency to the relationship between a franchisor and franchisee.  See Drexel, 582 F. 2d at 786.  While some degree of control is inherent in the franchisor-franchisee relationship, "the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship."  Id.  The question of whether a franchisor has retained sufficient control to establish an agency relationship depends entirely on the facts of each individual case, including the extent of the control as defined by the franchise agreement, and the actual practice of the parties . . . .
>
> While the language of a franchise agreement may be considered as one element in determining the relationship between the parties, the "crucial" facts in this determination are the actual practices of the parties.   Levin v. Wear Ever Aluminum, Inc., 442 F.2d 1307, 1309 n.1 (3d Cir. 1971).  The legal relationship between parties cannot depend on what the parties call it; it must be defined by what it actually is.

No. 15-5057, 2017 WL 2539395, at *2 (D.N.J. June 12, 2017).

Here, Hilton Defendants do not exercise day-to-day control over the Hotel through the FLA or their "actual practice" of enforcing the Brand Standards.  See id.  First, the FLA disclaims an express agency relationship between Defendants.  As noted previously, in the section titled "No Agency Relationship", the FLA states:

> [DoubleTree Defendants are] an independent contractor.  Neither of us is the legal representative or agent of the other or has the power to obligate the other for any purpose.  [DoubleTree Defendants] acknowledge that [Hilton Defendants] do not supervise or direct [DoubleTree Defendants'] daily affairs and that [DoubleTree Defendants] have exclusive control over [their] daily affairs.  [DoubleTree Defendants] expressly acknowledge that we have a business relationship based entirely on, and defined by, the express provisions of [the FLA] and that no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.

(Doc. No. 101-5 at 15.)

Second, by requiring and enforcing the Brand Standards, Hilton Defendants do not create an agency relationship because the Standards do not give them day-to-day control over the Hotel. Courts in New Jersey have held that "the right to conduct periodic inspections to ensure [brand] consistency and quality . . . does not give rise to the power to control the daily maintenance of the premises." Capriglione, 2011 WL 4736310, at *3.  See also J.M.L. ex rel. T.G., 877 A.2d at 297 (finding franchisor "provided little of no guidance on the day-to-day operations of the franchises.")[6]

---

[6]   Courts have rejected the argument that a franchisor's enforcement of its brand standards imposes vicarious liability for its franchisee's actions.  See, e.g., DiFederico v. Marriott Int'l, Inc., 130 F. Supp. 3d 986, 994 (D. Md. 2015) ("Liability, if any, is the responsibility of [the franchisee], because Marriott simply did not exert sufficient control over the operations of the [h]otel to make it responsible for Mr. DiFederico's death."); Capriglione v. Radisson Hotels Int'l, Inc., No. 10-2845, 2011 WL 4736310, at *3 (D.N.J. Oct. 5, 2011) ("Plaintiffs have not demonstrated that the relationship between the Hotel and [Radisson], as franchisor, evinces the degree of control that would warrant the imposition of vicarious liability under agency

Here, the Brand Standards only give Hilton Defendants the right to ensure brand consistency and quality though inspections and do not give them day-to-day control over the Hotel's maintenance.  The Brand Standards state that they are "minimum standards, procedures, rules, regulations, policies, and techniques" that Hilton Defendants require their DoubleTree franchisees to meet.  (Doc. No. 99-14 at 13) (see also Doc. No. 99 at 10 ¶¶ 53-54.)  In setting the Brand Standards, Hilton Defendants' purpose, as Julie Garrison, Hilton's Vice President of Brand Management testified is "[t]o provide minimum standards to ownership entities so that their properties can provide a consistent experience."  (Doc. No. 101-10 at 9 ¶¶ 16-20.)  Garrison confirms that Hilton Defendants leave Brand Standards implementation "up to the management company[,]" (Doc. No. 101-10 at 11 ¶¶ 13-14), and they do not "control or supervise the operation of, or staff at, the Hotel[,]" (Doc. No. 102-8 at 4 ¶ 10).  Hilton Defendants' lack of control or supervision of its franchise hotels is further evidenced by General Manager Sampson's statements that he discusses the Pool's maintenance and construction with other employees of Defendant Davis, watches the Pool during operating hours, and instructs other managers and staff on the Pool rules.  (See Doc. No. 101-12 at 12 ¶¶ 17-19, 16 ¶¶ 17-24, 17 ¶¶ 1-4.)  These facts show that DoubleTree Defendants, and not Hilton Defendants, operate the Hotel.  Therefore, because Hilton Defendants only set the Brand Standards and conduct biannual audits

---

principles." (citing J.M.L. ex rel. T.G., 379 N.J. Super. at 142)); Braucher ex rel. Braucher v. Swagat Grp., LLC, 702 F. Supp. 2d 1032, 1043 (C.D. Ill. 2010) ("Choice Hotels did not exercise sufficient control over the [h]otel to be considered an operator of the [h]otel."); Triplett v. Soleil Grp., Inc., 664 F. Supp. 2d 645, 653 (D. S.C. 2009) ("Thus, the court does not find that Starwood and Sheraton controlled the day-to-day operations of the [h]otel or the maintenance and operation of the swimming pool and whirlpool tub."); Hunter v. Ramada Worldwide, Inc., No. 1:04CV00062ERW, 2005 WL 1490053, at *7  (E.D. Mo. June 23, 2005) ("The Agreement cannot be said to give Ramada the control over the day-to-day operations of the [h]otel necessary to create an agency relationship.")

to ensure DoubleTree Defendants abide by them, they do not have day-to-day control of the Hotel.

In arguing that Hilton Defendants have day-to-day control over the Hotel, Plaintiffs analogize the facts here to the facts in eTeam, Inc. and Michalak, two decisions in which New Jersey courts denied a franchisor summary judgment.   These decisions are unpersuasive, however, because in both cases there was evidence showing greater day-to-day control than in the case here.  In eTeam, Inc., a third-party sued Hilton because it was billed for what the third-party contended was an unauthorized stay at a Hilton franchisee hotel.  Because Hilton retained "direct control over . . . the reservation processing and payment system at the [h]otel[,]" it exercised enough day-to-day control over the hotel to raise a genuine dispute about Hilton's vicarious liability.  eTeam, Inc., 2017 WL 2539395, at *4.  And in Michalak, the plaintiff, who believed that she was harassed by a supervisor, spoke with an employee of franchisor ServPro Industries, Inc. about the alleged workplace harassment and was told by the employee "a full investigation would be performed."  Michalak v. ServPro Indus., Inc., No. 18-1727, 2019 WL 3562690, at *2 (D.N.J. Aug. 6, 2019).  Because ServPro would be involved in the investigation, sufficient day-to-day control was established.  See id.

In this case, Hilton Defendants did not have day-to-day control over the Hotel.  Neither the FLA, Brand Standards, nor the biannual audits show the creation of an actual agency relationship between DoubleTree and Hilton Defendants.   The FLA excludes an agency relationship and the Brand Standards, including the ones for the Pool, are only meant to set minimum standards and to maintain consistency of the Hilton Brand.  For these reasons, there is no genuine dispute of material facts that an actual agency relationship between DoubleTree and Hilton Defendants has been proven.

2.        **Apparent Authority**

Plaintiffs also contend that an agency relationship between Hilton and DoubleTree Defendants exists based on apparent authority.  "Apparent authority imposes liability, not as a result of an actual contractual relationship, but because of actions by a principal which have misled a third party into believing that a relationship of authority does, in fact, exist." Wilzig v. Sisselman, 209 N.J. Super. 25, 35 (Ct. App. Div. 1986) (citation omitted).  "In order to recover against the principal under apparent authority, a party must show that: '(1) the appearance of authority has been created by the conduct of the alleged principal and not solely by the conduct of the putative agent; (2) a third party has relied on the agent's apparent authority to act for a principal; and (3) the reliance was reasonable under the circumstances.'" Capriglione, 2011 WL 4736310, at *4 (first quoting Mayflower Transit, LLC v. Prince, 314 F. Supp. 2d 362, 374 (D.N.J. 2004); then citing Gizzi v. Texaco, 437 F.2d 308, 309 (3rd Cir. 1971)).  "[T]he essential element of reliance must be present before apparent authority can be found." Wilzig, 209 N.J. Super. at 36 (citation omitted).

Here, Plaintiffs do not allege facts that raise an inference that Khadir relied on the alleged apparent authority.  They contend that "[r]elying on the 'badge' of the Hilton, guests come to this premises with an expectation that the property is safe for its intended use," and analogize this notion to Khadir's situation.  (Doc. No. 105-2 at 21-22.)  Khadir, a seven-year-old, came to the Hotel to use the Pool and be with his aunt, Bria Johnson.  Johnson, as an employee of another DoubleTree hotel, brought the eight children with her at least in part to have access to the Pool. Given her knowledge of how a franchisee operates, she did not focus on the Hilton brand, and most certainly nor did Khadir.  Furthermore, as a DoubleTree hotel employee, Johnson testified that she went to the Hotel because she received a discounted employee rate and it was close to

18

their eventual destination, not because of the Hotel's Hilton association or Brand Standards. (See Doc. No. 102-1 at 3 ¶¶ 22-24, 4 ¶¶ 20-22, 8 ¶¶ 12-14.)

For the foregoing reasons, when the facts are viewed in a light most favorable to Plaintiffs, there is no genuine dispute of material facts that Hilton Defendants have an agency relationship with DoubleTree Defendants.  No actual or apparent authority by Hilton Defendants through day-to-day control of the Hotel has been established.  Because no agency relationship exists, Hilton Defendants are not vicariously liable for DoubleTree Defendants' alleged negligence.  Therefore, summary judgment on the issue of Hilton Defendants' vicarious liability will be granted in favor of Hilton Defendants and against Plaintiffs.

### B.    Hilton Defendants' Direct Liability

Plaintiff and Hilton Defendants also move for summary judgment on whether Hilton Defendants were directly negligent in causing Khadir's death.  (See Doc. Nos. 99-1 at 10-11; 105-2 at 4.)  "The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages."  Robinson v. Vivirito, 86 A.3d 119, 124 (N.J. 2014) (citing Jersey Cent. Power & Light Co. v Melcar Util. Co., 59 A.3d 561, 571 (N.J. 2013); Weinberg v. Dinger, 524 A.2d 366, 373 (N.J. 1987)).  The critical question here involves the first element of negligence, whether Hilton Defendants owed a duty of care to Khadir.  This is a question of law for the court to determine.  See Strachan v. John F. Kennedy Memorial Hosp., 109 N.J. 523, 529 (1988).

Plaintiffs' negligence claim arises under the law of premises liability, as Khadir died while on the Hotel's land.  In premises liability cases, New Jersey law imposes upon owners and possessors of land a duty of care to those who enter the premises.  Peguero v. Tau Kappa Epsilon

Local Chapter, 439 N.J. Super. 77, 89-90 (Ct. App. Div. 2015).  To possess land, a person must be "in occupation of the land with intent to control it[.]"  Restatement (Second) of Torts § 328E (1965).

Here, when viewing the facts in a light most favorable to Plaintiff, there is no genuine dispute of material fact on whether Hilton Defendants owed Khadir a duty of care because they neither own nor possess the Hotel.  It is undisputed that Defendant Davis, and not Hilton Defendants, owns the Hotel.  (See Doc. Nos. 101-2 at 3 ¶ 4; 105-1 at 2 ¶ 4.)  Moreover, the facts described previously show that Hilton Defendants do not possess the Hotel because they have no agency relationship with DoubleTree Defendants and no intent to control the Hotel. Furthermore, as Capriglione confirms, "Plaintiffs have failed to cite a single case that supports the proposition that a franchisor has a duty to the guest of a hotel of which it does not directly own or exercise control.  Nor has this Court found any such case."  2011 WL 4736310, at *3. For these reasons, summary judgment on Hilton Defendants' direct liability will be granted in favor of Hilton Defendants and against Plaintiffs.[7]

### C.    DoubleTree Defendants' Vicarious Liability for the Actions of Best Pool Management, Inc.

Plaintiffs alone move for summary judgment regarding their claims against DoubleTree Defendants.  They first claim that they are entitled to summary judgment because DoubleTree Defendants are vicariously liable for Defendant Best Pool Management, Inc.'s alleged negligence.  (See Doc. No. 99-1 at 7.)  In asserting this vicarious liability claim, they argue DoubleTree Defendants have an agency relationship with Best Pool Management, Inc. because they exercise day-to-day control over Best Pool Management, Inc.  (See id.)  When viewing the

---

[7]   Because Hilton Defendants did not owe a duty of care to Khadir, the Court need not address the admissibility of Plaintiffs' evidence of other drownings at Hilton-franchised hotels.

facts in a light most favorable to the non-movant DoubleTree Defendants, there is a genuine dispute of material facts regarding whether an agency relationship exists.

As discussed above in analyzing whether Hilton Defendants are vicariously liable for DoubleTree Defendants, in New Jersey an entity is vicariously liable for the actions of another if there is an agency relationship between the parties. See J.M.L. ex rel. T.G., 877 A.2d at 296. An agency relationship exists if the purported principle has "day-to-day" control over the operations of the alleged agent. See id. at 297; see also eTeam, Inc., 2017 WL 2539395, at *2 ("The hallmark of an agency relationship is that the principal has the right to control the manner in which the agent performs his duties[.]") (citation omitted).

Here, Plaintiffs argue that DoubleTree Defendants exert day-to-day control over Best Pool Management, Inc, by "set[ting] the hours, control[ing] the issuing of supplies, . . . and reprimand[ing] the lifeguards and instruct[ing] them on how to interact with [H]otel guests." (Doc. No. 99-1 at 8.)  DoubleTree Defendants, however, present countervailing facts to show they do not have day-to-day control over Best Pool Management, Inc.  (See Doc. No. 122 at 6.) In particular, they highlight lifeguard Logan DeBlieu's testimony that none of the employees of DoubleTree Defendants discussed the rules or management of the Pool with him and did not give him any documents prescribing the rules.  (See id.)  These facts alone show a genuine dispute of material facts over whether DoubleTree Defendants exercised the requisite day-to-day control over Best Pool Management, Inc. to create an agency relationship.  For this reason, summary judgment on Plaintiffs' claim of DoubleTree Defendants' vicarious liability with Best Pool Management, Inc. will be denied.[8]

---

[8]  Plaintiffs also argue that DoubleTree Defendants are vicariously liable for the alleged negligence of Best Pool Management, Inc. because operating the Pool is an abnormally dangerous activity.  (See Doc. No. 99-1 at 7.)  Best Pool Management, Inc. is an independent

### D.      DoubleTree Defendants' Direct Liability

Finally, Plaintiffs argue they are entitled to summary judgment because DoubleTree Defendants were directly negligent in causing Khadir's death.  (See Doc. No. 99-1 at 3.)  "The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages."  Robinson, 86 A.3d at 124 (citing Jersey Cent. Power & Light Co., 59 A.3d at 571; Weinberg, 524 A.2d at 373).  Under New Jersey premises liability law,[9] "an 'owner or operator of a hotel is under a duty to exercise ordinary care to render the premises reasonably safe for the use of its guests.'"  Sanders v. Sheraton Hotels & Resorts, No. 11-5489, 2014 WL 60011, at *4 (D.N.J. Jan. 7, 2014) (citations omitted).

Plaintiffs aver that DoubleTree Defendants owed a duty of care to Khadir to keep the premises reasonably safe because he was a Hotel guest.  (See Doc. No. 99-1 at 3.)  They argue that the premises were not reasonably safe, thus breaching DoubleTree Defendants' duty of care

_____

contractor doing business with DoubleTree Defendants.  (See id.)  "Ordinarily, an employer that hires an independent contractor is not liable for the negligent acts of the contractor in the performance of the contract."  Bahrle v. Exxon Corp., 678 A.2d 225, 231 (N.J. 1996) (citations omitted).  Despite this exclusion, "[t]he employer remains liable . . . for work that is inherently dangerous . . . . [and] is strictly liable for harm resulting from the performance by an independent contractor of abnormally dangerous work."  Id. (citations omitted).  The mere danger or potential of "casual or collateral negligence[,]" however, does not give rise to an abnormally dangerous activity.  See Mavrikidis v. Petullo, 707 A.2d 977, 990 (N.J. 1998).

Plaintiffs have not provided any legal authority holding that operating a swimming pool is an abnormally or inherently dangerous activity.  Although they assert that operating the Pool in an "unsecured, unguarded" manner with improper signage is abnormally dangerous, (Doc. No. 99-1 at 7), these facts are more akin to casual or collateral negligence.  This is underscored by the fact that Plaintiffs rely on these facts in arguing that DoubleTree Defendants negligently operated the Pool.

[9]  Plaintiffs' negligence claim arises under the law of premises liability because Khadir was injured while at the Hotel.

to Khadir, because the Pool: (1) did not have card key locks, (2) had improper signage required by New Jersey law, and (3) was unguarded by a lifeguard.  (See id. 99-1 at 4.)  Despite these contentions, DoubleTree Defendants have established there is a genuine dispute of material facts regarding their liability for direct negligence, and summary judgment on the issue of DoubleTree Defendants' direct liability will be denied.[10]  (See Doc. No. 122 at 2-5.)

Defendants contest Plaintiffs' evidence by relying on the Hotel's surveillance footage, the expert report of John Hogan (the "Hogan Report"), who has over forty-five years of experience in the hotel industry, and the depositions of the following persons: Dean Sampson, the Hotel General Manager, Christopher Doyle, who inspected the Hotel on behalf of Hilton Defendants, third-party Defendant Bria Johnson, and Christopher Pride, the Hotel's front desk attendant. (See Doc. Nos. 101-9 at 2; 122 at 2-3, Exs. A, B, C, D.)

First, DoubleTree Defendants contest whether the absence of electronic card key locks on the Pool area doors breached their alleged duty of care to Khadir.  Hogan and Sampson both state that electronic card key locks would not have prevented Khadir's entry into the Pool area because the Hotel's guests "constantly prop" open the Pool area's entrances.  (Doc. No. 122 at 2.)   The Hogan Report also states the lack of electronic card key locks did not breach

---

[10]   For purposes of this Opinion, the Court has assumed, without finally deciding, that DoubleTree Defendants owed a duty of care to Khadir Baynes.  Because Plaintiffs' summary judgment Motion is being resolved against them for the reasons given, the Court will forego making a decision on the applicability of duty of care based on this record.  This decision will await trial where a more complete factual record will be presented.  At that time, the Court will apply New Jersey's four-part legal test used to determine the scope of a landowner's duty of care.  See Sussman v. Mermer, 373 N.J. Super. 501, 505 (Ct. App. Div. 2004) (enumerating the four-factors as "(1) the relationship of the parties, (2) the nature of the attendant risk, (3) the opportunity and ability to exercise care, and (4) the public interest in the proposed solution.") (citations omitted).

DoubleTree Defendants' alleged duty of care because they were not required either as a hotel industry custom or by the Brand Standards at the time the FLA was executed.[11]  (See id. at 2-3.)

Second, the Hogan Report contests whether the signage at the Pool either breached a duty of care owed to Khadir or caused Khadir's drowning.  (See id. at 3.)  Hogan opines in his Report that the signs did not render the Pool unreasonably safe because they met statutory and industry standards and the one-page notice provided to Hotel guests on weekends exceeded industry custom.  (See id.)  Additionally, the Report asserts that the signs did not cause Khadir's death because he was not permitted to enter the Pool area.[12]  (See id.)

Third, the Report states that the lifeguard's absence when Khadir entered the Pool does not establish DoubleTree Defendants acted negligently.  (See id.)  Hogan opines that the absence did not breach any duty of care because neither New Jersey municipal law nor hotel industry standards required a lifeguard at the Pool area, and this was merely an additional precaution.  (See id.)

Finally, the Report, in conjunction with Pride's testimony and the Hotel's surveillance footage, supports an inference that Pride could not have prevented the drowning after DeBlieu told him unsupervised children were in the Pool area.  By the time DeBlieu spoke with Pride and left the front desk, Khadir was struggling for over thirty seconds.  (See Doc. Nos. 99 at 3-5 ¶¶

---

[11]  Although the Brand Standards require card key access to the Pool, (see Doc. No. 99-14 at 261), DoubleTree Defendants argue that this Brand Standard was added after the parties executed the FLA (see Doc. No. 122 at 3).  As a result, DoubleTree Defendants contend that they were not required to comply with this Brand Standard until renewal of the FLA, and a lack of compliance is not a breach of their alleged duty of care.  (See id.)

[12]  Third-party Defendant Bria Johnson, who brought Khadir and the other children to the Hotel, confirms that her reservation did not include any children.  (See Doc. No. 122 at 3.)  Furthermore, Ms. Johnson did not inform the front desk that she brought children to the Hotel.  (See id.)  DoubleTree Defendants argue that because Khadir was not a registered guest, he was not permitted to enter the Pool area.  (See id.)

10, 20-24; 101-2 at 6-7 ¶¶ 20, 24-25; 101-9 at 8-9.)  Based on this timing, Hogan hypothesizes that even if Pride acted when he knew unsupervised children were in the Pool area, he could not have prevented Khadir's death.  (See Doc. No. 101-9 at 18-19.)

Viewing all of these facts in a light most favorable to DoubleTree Defendants, they raise genuine disputes of material facts regarding their direct liability.  Thus, summary judgment in favor of Plaintiffs on DoubleTree Defendants' direct liability will be denied.

V.     **CONCLUSION**

For the foregoing reasons, Plaintiffs' cross-Motion for Summary Judgment (Doc. No. 98) will be denied, and Hilton Defendants' cross-Motion for Summary Judgment (Doc. No. 101) will be granted.   The claims against Defendants Hilton Worldwide Holdings, Inc. and Hilton Franchise Holding, LLC in Counts I, III, and IV will be dismissed.   The claims against Defendants Davis Enterprises and DoubleTree Suites by Hilton Mount Laurel in Counts I, III, and IV remain in this case for a jury's consideration.  An appropriate Order follows.